IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

STATE OF WASHINGTON, ) No. 70811-2-I
)
Respondent, )
)
v. ) UNPUBLISHED OPINION
)
CU VAN TRUONG, )
)
Appellant. ) FILED: April 27, 2015

SCHINDLER, J. — Cu Van Truong appeals his jury conviction for murder in the first

degree while armed with a firearm. Truong contends prosecutorial misconduct during

closing argument deprived him of a fair trial. In the alternative, Truong argues defense

counsel was ineffective by failing to object to the misconduct. Because Truong fails to

show prosecutorial misconduct, we affirm.

## FACTS

From November 19 until December 22, 2011, Jason Saechao was in jail for a

probation violation stemming from a domestic violence incident involving Ilyan Vang.

Saechao and Vang had been involved in a relationship for approximately eight years and

had a four-year-old daughter. Saechao was often physically and emotionally abusive to

Vang.

While Saechao was in jail, Vang had sex with Cu Van Truong and Huang "Wayne" Duong. Vang characterized her relationship with Truong as a one-night stand. But Vang said she believed she was in the beginning of a relationship with Duong. Saechao and Duong were friends.

After Saechao was released from jail, Vang told him she had sex with Truong and Duong and she wanted to end their relationship. Saechao told Duong he wanted "some sort of compensation" from him for having sex with Vang. Saechao suggested Duong give him money. Duong offered to give Saechao his tax refund when he received it. In the meantime, Duong said he gave Saechao an expensive jade necklace as collateral.

On December 27, Vang spent the early evening smoking methamphetamine with her friend Karla Diocales. Vang and Diocales met Duong and Truong at a restaurant for dinner. Vang contacted a "connection" to help Truong get some methamphetamine. After about an hour, Vang and Truong left the restaurant. Truong drove to Alki Beach. Vang said Truong pointed out a house under construction and told her the house was "going to be the house [Vang] and [her] daughter and [Truong] will be living at." Vang thought his remark was confusing because she and Truong were not dating and had never discussed being in a relationship.

After Truong drove to a casino to gamble, Vang called Diocales to come and get her. Before leaving the casino, Vang told Truong to meet her later at Seattle Roll Bakery if he was still interested in obtaining some methamphetamine. Duong worked nights at Seattle Roll Bakery. Vang frequently got together with her friends and Duong at the bakery at night to smoke methamphetamine and hang out.

2

When Vang and Diocales arrived at the bakery, Duong unlocked the door. Duong began preparing loaves of bread for baking while Vang and Diocales smoked methamphetamine. Sometime thereafter, Saechao came to the bakery looking for Vang. Saechao was irritated with Vang because he had been trying to reach her to obtain the name of a "connection" and she was not answering her phone.

After Truong arrived at the bakery, Vang heard Truong and Saechao arguing. Truong told Saechao, "I heard you were trying to set me up." Saechao responded that "if I was trying to set you up it would have been done already." Truong asked Saechao about Duong's jade necklace, saying, "[D]id you take my little homie's necklace?" Truong demanded Saechao give the necklace back to Duong. Saechao insisted he had not taken the necklace and Duong had given it to him. Duong told Truong to "leave it alone." But Truong insisted Saechao give the necklace back to Duong. After Saechao said, "[W]hat are you going to do about it," Truong pulled a handgun out of his waistband and shot Saechao four times. The first shot hit Saechao in the leg. The second and third shots hit Saechao in his midsection. Truong then said, "[F]uck it," and "took the gun and pointed straight down in the middle of [Saechao's] head and shot him." Waving the gun around, Truong told Vang, Duong, and Diocales he would "come back" if they said anything, and then fled.

Duong called 911. Duong reported an unknown assailant shot Saechao during an attempted robbery. Diocales, who had "[a] lot of other cases going on," told Vang, "I can't be here so don't tell the police that I was here or anything," and left.

Detectives took witness statements from Duong and Vang. Because Duong was afraid that Truong would retaliate against him or his family, he told the detectives that "it

3

was some random person that, you know, seen me counting money or whatever." Duong later admitted that he "just completely told [the detectives] a fib" and that Truong was the shooter. Vang initially said it was a robbery but then agreed to tell the detectives the truth, and identified Truong as the shooter.

The police arrested Truong. Truong told police he "didn't do anything." During the interview with detectives, Truong repeatedly denied being at the bakery the previous night.

After being booked into jail, Truong called Vang. Truong told Vang he did not see her after she left the casino. Truong said he did not know what was going on and asked Vang to come visit him. Vang refused and hung up.

During the investigation, forensic testing established Saechao's blood was on Truong's sweatshirt. Before the trial began, Truong claimed he had acted in self-defense.

Vang, Duong, and Diocales testified Saechao did not have a gun and did not threaten Truong. All three admitted to being addicted to methamphetamine and having a criminal history involving crimes of dishonesty.

A medical examiner testified the first three shots to Saechao were not lethal, but the final shot to the head was a contact shot that would have caused nearly instantaneous death. A firearms expert from the Washington State Patrol Crime Laboratory testified that the entry wound in Saechao's head showed a "stippling pattern" and "laceration marks . . . consistent with a contact shot" at very close range.

Truong testified that an angry Saechao approached him as soon as he arrived at the bakery and demanded Truong give him his diamond earrings and money. Truong

4

said he refused and walked away. Truong testified Saechao followed him, "still yapping his mouth," and told Truong to "give him the stuff or he's going to cap my ass." Truong said that as he "turned halfway around," he saw Saechao reach for his waistband.

Truong said that when he first met Saechao a couple of months earlier, Saechao had "pulled out a gun" and pointed it at him. Truong testified that this incident, coupled with what Vang had told him about Saechao's physical abuse of her, made him fear for his life. Truong testified that he grabbed his own gun and shot Saechao while running out of the bakery. Truong said he threw the gun in a dumpster and went to a friend's house. Truong admitted he lied to the police when he told them he had not been at the bakery that night.

The jury convicted Truong of murder in the first degree while armed with a firearm.

## ANALYSIS

Truong seeks reversal of his conviction on the grounds that prosecutorial misconduct during closing argument deprived him of the right to a fair trial. In the alternative, Truong argues his attorney provided ineffective assistance of counsel by failing to object to the misconduct.

### Prosecutorial Misconduct

Prosecutorial misconduct may deprive a defendant of his right to a fair trial. State v. Davenport, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). To prevail on a claim of prosecutorial misconduct, a defendant must establish that the conduct was both improper and prejudicial. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).

Misconduct is prejudicial where there is a substantial likelihood the improper conduct affected the jury's verdict. State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359

5

(2007). But where, as here, defense counsel fails to object, any error is waived unless the conduct was so "flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by admonition to the jury." State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997).

> Proper and timely objections provide the trial court an opportunity to correct the misconduct and caution jurors to disregard it. It prevents abuse of the appellate process and saves the substantial time and expense of a new trial.

State v. Walker, ___ Wn.2d ___, 341 P.3d 976, 984 (2015) (citing State v. Emery, 174 Wn.2d 741, 761-62, 278 P.3d 653 (2012)). In determining whether there was prejudice that could have been neutralized by an instruction to the jury, we focus less on whether the misconduct was flagrant or ill-intentioned and more on whether any misconduct could have been obviated by a curative instruction. Emery, 174 Wn.2d at 762.

The defendant bears the burden of establishing remarks made during closing argument were improper as well as their prejudicial effect. State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). Even if improper, remarks by the prosecutor are not grounds for reversal "if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." Russell, 125 Wn.2d at 86. We review the allegedly improper comments in the context of the entire closing argument, the issues presented, the evidence addressed, and the instructions given to the jury. Russell, 125 Wn.2d at 85-86.

Truong claims the prosecutor improperly vouched for the credibility of Vang and Duong by arguing that "the only thing we told them was come in here and tell the truth. . . . And that's exactly what they did." Truong contends the prosecutor "declared Vang

6

and Duong told the truth, not because the evidence supported that conclusion, but because they had been instructed to do so by the prosecutors." The record does not support his argument.

It is improper for a prosecutor to vouch for the credibility of a witness because the trier of fact has sole authority to assess the credibility of witnesses. State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010).

> Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony.

State v. Allen, 161 Wn. App. 727, 746, 255 P.3d 784 (2011).

However, a prosecutor has wide latitude to draw reasonable inferences from the evidence. Stenson, 132 Wn.2d at 727. Accordingly, it is not misconduct for a prosecutor to argue that a witness is truthful based on inferences from the evidence. State v. Rivers, 96 Wn. App. 672, 674-75, 981 P.2d 16 (1999). " 'Prejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion.' " State v. McKenzie, 157 Wn.2d 44, 54, 134 P.3d 221 (2006)[1] (quoting State v. Papadopoulos, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

The prosecutor's remarks as to Vang did not constitute vouching because they were based on the evidence. Defense counsel questioned Vang at trial about meetings with the prosecutor and the documents she had been given to review prior to testifying. In response to the prosecutor's questions on redirect, Vang testified that the prosecutor did not go over her testimony with her and did not give her copies of reports, witness

---

[1] Emphasis omitted.

statements, or transcripts other than her own. Vang testified that the prosecutor told her only "just to be honest." As to Duong and Diocales, the prosecutor questioned them about whether they had conferred with each other about their testimony.

Further, when viewed in context, it is clear that the prosecutor was not expressing a personal belief that Duong and Diocales had testified truthfully. The prosecutor stated, in pertinent part:

> You heard from the three witnesses, whose lives are forever changed by Cu Truong. We told you in opening that you would hear from a group of young people who were [flawed] and you did. Ms. Vang was in jail. Ms. Diocales had just gotten out of court ordered treatment. Mr. Duong came. Stayed clean for three days waiting for his turn to testify. And they told you what happened that day.
> I have no doubt that in closing defense will point out to you what they believe are some inconsistencies between these witness's testimony. But loud and clear each witness told detectives, told us in interviews, and told you in trial multiple times there was never any physical confrontation between Jason Saechao and Cu Truong. Jason Saechao never threatened to kill or cap Cu Truong. Jason Saechao didn't have a gun. He didn't display a gun, and he didn't fire a gun that day.
> You know, there are moments in every trial when you get the purest of purest glimpses into that human element. It can't be practiced, and it can't be rehearsed. We didn't sit down with these witnesses and practice their direct testimony. We didn't show them anything, other than their own transcripts. <u>And the only thing we told them was come in here and tell the truth</u>. Admit you are a meth addict. Admit you were smoking meth that day. And admit your initial story to the cops wasn't true. Ms. Diocales, admit that you cowardly ran off and left your friends there to deal with the cops. But tell this jury exactly what happened, and don't hide from anything. <u>And that's exactly what they did</u>. And you see in those human moments they are not proud that they were smoking meth. They are not proud that they were out looking for drugs. And they were certainly beyond question traumatized by what they saw. Tears. Shaken up.
> Ms. Vang, I wish, I so wish that when Cu called me from jail I wish I could have asked him why. You know why she wants to ask why? Because there's no good reason for what Cu Truong did that day. Mr. Duong. No, counsel, I'm not high. I'm not sitting here high. Yeah, I'm nervous. Because for the first time I'm looking at the man that shot my friend. Human moments where you get to see a demeanor, and an honesty, and a rawness that can't be rehearsed, and can't be practiced,

and tells you that these people came in here and told you exactly what happened that day.[2]

Nonetheless, even if the remark was improper, Truong does not demonstrate that a timely instruction would not have cured any prejudice.

The case Truong relies on, Ish, is distinguishable. In Ish, the court held the State vouched for a witness's credibility by asking about a plea deal that required the witness to "testify truthfully." Ish, 170 Wn.2d at 198-99. The court concluded this was misconduct because "such testimony suggests that the witness might have been compelled to tell the truth by the prosecutor's threats and the State's promises." Ish, 170 Wn.2d at 197-99. However, the court did not "have any difficulty concluding that the error . . . was harmless" because other evidence corroborated the witness's testimony and the State did not dwell on the issue. Ish, 170 Wn.2d at 200-01.

Next, Truong contends the prosecutor committed misconduct by arguing that Truong hoped "maybe the jury won't care" about Saechao, but "[w]e know [Truong]'s wrong." Truong argues the prosecutor improperly appealed to the jury by suggesting "that an acquittal would indicate that the jury, like Truong, did not care about Jason Saechao." Truong also argues the remark, "We know [Truong]'s wrong," defined "a group of caring people that included the prosecutor and the jury but excluded Truong."

A prosecutor may not make comments designed to appeal to the passion and prejudice of the jury or to encourage a verdict based on emotion rather than evidence. State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). Likewise, a prosecutor

---

[2] Emphasis added.

must refrain from making comments "calculated to align the jury with the prosecutor and against the [accused]." State v. Reed, 102 Wn.2d 140, 147-48, 684 P.2d 699 (1984).

The record shows the prosecutor did not encourage the jury to convict Truong based on passion and prejudice by making the remark, "[M]aybe the jury won't care." The prosecutor argued that because Truong portrayed Saechao as an abusive methamphetamine addict who "was in and out of jail[,] [t]hat's what they want you to filter all of this evidence through." The prosecutor told the jury that it had a responsibility to put aside any such bias and determine whether Truong killed Saechao in self-defense.

We also conclude the statement "[w]e know [Truong]'s wrong" was not an improper attempt to align the jury with the State but, rather, a rhetorical device the prosecutor used before describing the evidence showing Truong's claim of self-defense was not credible.

> And the other, oft repeated, I submit rehearsed response, I was scared for my life. Couple of human moments that Mr. Truong couldn't avoid. From what I've learned of Jason, I was scared of my life. From what you've learned of Jason, since the time you shot him? And from what you've learned of Jason that you know the jury will hear? And you hope, you just hope that maybe the jury won't care either. And he's wrong. We know he's wrong.
> See, Jason Saechao never pulled a gun on him. Because if Jason Saechao had pulled a gun on him in October or November, then why, knowing that Jason Saechao was at that bakery, would he number one come to the bakery, and arm himself with a firearm? Well, because he wanted to kill Jason. But more importantly, walk around that bakery as Jason's yapping his mouth, and turn his back on Jason how many times, before he pulled out his gun and finished Jason Saechao's life.[3]

Last, Truong argues that during rebuttal, the prosecutor improperly told the jury the forensic evidence establishing Truong purposefully shot Saechao in the head "is about

---

[3] Emphasis added.

the best evidence you are going to get." Truong argues this statement "implies a wealth of experience of other cases in which defendants have been found guilty beyond a reasonable doubt and suggests to the jury that there could be no better evidence on which to convict." We disagree.

A prosecutor may argue evidence does not support a defense theory and present a fair response to defense counsel's arguments. Russell, 125 Wn.2d at 87. The prosecutor did not refer to other cases. Instead, the prosecutor's remarks were made in response to defense counsel's argument that Truong accidentally shot Saechao in the head at point-blank range because Saechao collapsed and fell forward as Truong brushed past him to flee out the door. The prosecutor pointed to the testimony of the medical examiner and the firearms expert that there was "perfect evidence of a contact wound" to demonstrate Truong "intend[ed] to kill Jason Saechao and nothing less." The prosecutor argued that the forensic evidence and the nature of the wounds showed Truong was not firing randomly or in fear when he shot Saechao.

Truong contends that even if none of the alleged remarks alone warrant reversal, the cumulative effect of the remarks denied him a fair trial. The cumulative effect of multiple or repeated incidents of prosecutorial misconduct may be so prejudicial as to warrant reversal, even if individual instances standing alone would not. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Here, there were not multiple or repeated incidents of prosecutorial misconduct during closing argument.

Ineffective Assistance of Counsel

In the alternative, Truong contends his attorney provided ineffective assistance of counsel by failing to object to the prosecutor's remarks during closing argument. To

11

establish ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the performance prejudiced the defendant's case. Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness. Stenson, 132 Wn.2d at 705-06. To satisfy the prejudice prong, a defendant must show a "reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

There is a strong presumption that counsel provided effective assistance. State v. Tilton, 149 Wn.2d 775, 784, 72 P.3d 735 (2003). To rebut this presumption, a defendant bears the burden of establishing the absence of any " 'conceivable legitimate tactic explaining counsel's performance.' " State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

Here, Truong has not shown that defense counsel did not have any conceivable and legitimate reason not to object or that if his attorney had objected to the three remarks during closing argument, the result of the trial would have been different.

Additional Grounds for Review

In a statement of additional grounds for review, Truong cites several other instances of alleged prosecutorial misconduct during closing argument. Truong contends the prosecutor improperly expressed a personal opinion by arguing that Truong exhibited no remorse or emotion over killing Saechao. Truong is incorrect. The prosecutor was not expressing a personal opinion. Rather, the prosecutor was arguing Truong's claim of self-defense was not credible based on the evidence.

12

Truong also asserts it was misconduct for the prosecutor to argue Truong "thought he could pull one over on you guys." However, "[w]here a prosecutor shows that other evidence contradicts a defendant's testimony, the prosecutor may argue that the defendant is lying." McKenzie, 157 Wn.2d at 59.[4]

Truong also contends the trial court violated his right to free exercise of religion under the First Amendment to the United States Constitution by requiring him to "swear" or "affirm" before testifying instead of using his own oath. To demonstrate a First Amendment violation, an individual must demonstrate that he holds a sincere religious belief and that the government excessively burdens that belief. Munns v. Martin, 131 Wn.2d 192, 199-200, 930 P.2d 318 (1997). Truong fails to make this showing.

We affirm the jury's conviction of Truong for murder in the first degree while armed with a firearm.

WE CONCUR:

---

[4] Truong's remaining challenges to remarks made by the prosecutor lack reasoned argument or citation to relevant authority and do not merit review.